## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JENNIFER DIAL a/k/a JENNIFER STEPHENS; MINDY MARKOWITZ; and ROBERT FEEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN COLLEGIATE MARKETING, INC.; and PRIORITY ONE CLEARING SERVICES, LLC,<br><br>Defendants. | Case No. 2:22-cv-12282-TGB-APP<br><br>Hon. Terrence G. Berg<br>Mag. Anthony P. Patti<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jennifer Dial a/k/a/ Jennifer Stephens ("Plaintiff Dial"), Mindy Markowitz ("Plaintiff Markowitz"), and Robert Feen ("Plaintiff Feen") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### INTRODUCTION

1.      Defendants American Collegiate Marketing, Inc. ("ACM") and Priority One Clearing Services, LLC ("POCS") (collectively, "Defendants") rented,

exchanged, and/or otherwise disclosed detailed information about Plaintiffs' *CBS Watch!* magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others – including, without limitation, Nextmark, Inc. and Wiland, Inc. – which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period,[1] Defendants violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.      Documented evidence confirms these facts. For example, a list broker,

---

[1]      The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]      In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 682-83 (W.D. Mich. 2018).

NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "CBS Watch! Magazine Subscribers Mailing List", which contains the Private Reading Information of all 151,355 active and recently expired U.S. subscribers to *CBS Watch!* magazine at a base price of "$100.00/M [per thousand]," (i.e., 10 cents apiece), as shown in the screenshot below:



*See* **Exhibit A** hereto. The same or a substantially similar "data card" as the one shown above, with the same or similar rates and advertised demographic and

personal information about all U.S. based purchasers of *CBS Watch!* subscriptions as listed above, was also publicly advertised as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating Defendants were renting, selling, exchanging, and otherwise disclosing all of their customers' Personal Reading Information (including Plaintiffs' and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.

3.      Indeed, during relevant pre-July 31, 2016 time period, the Nextmark website also offered to provide renters access to the mailing list titled "Watch! Magazine Wiland Direct Modeled File", which contained the Private Reading Information of all then-active and recently expired U.S. subscribers to *CBS Watch!* Magazine (including Plaintiffs and all Class members) at a base price of "$100.00/M [per thousand]," (i.e., 10 cents apiece).

4.      As a result of Defendants' practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes following their purchases of subscriptions to *CBS Watch!* over the same time period.

5.      By renting, exchanging, or otherwise disclosing the Private Reading Information of all their *CBS Watch!* magazine subscription purchasers (including, as relevant here, all U.S.-based purchasers in the case of ACM, and all Michigan-based

purchasers in the case of POCS) during the relevant pre-July 31, 2016 time period,

Defendants violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

6.      Accordingly, Plaintiffs bring this First Amended Class Action Complaint against Defendants for their intentional and unlawful disclosure of their customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

7.      To supplement its revenues, Defendants rent, exchange, or otherwise disclose their customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives, and other third parties – including, without limitation, Nextmark, Inc. and Wiland, Inc. – without the written consent of their customers.  Defendants continuously engaged in these same practices since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

5

8.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, Defendants are able to disclose the information time and time again to countless third parties.

9.     Defendants' disclosures of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

10.    While Defendants profit handsomely from the unauthorized rental, exchange, and/or disclosure of their customers' Private Reading Information and other individualized information, they do so at the expense of their customers' statutory privacy rights (afforded by the PPPA) because they do not obtain their customers' written consent prior to disclosing their Private Reading Information.

## PARTIES

11.    Plaintiff Dial is a natural person and citizen of the State of Michigan and resides in Macomb, Michigan.  Plaintiff Dial was a subscriber to *CBS Watch!* magazine, including prior to July 31, 2016.  While residing in, a citizen of, and present in Michigan, Plaintiff Dial purchased her subscription to *CBS Watch!* magazine directly from ACM, by sending ACM money to its headquarters in Okemos, Michigan.  ACM collected the money paid to it by Plaintiff Dial for her *CBS Watch!* subscriptions in Michigan.  Prior to and at the time Plaintiff Dial subscribed to *CBS Watch!*, ACM did not notify Plaintiff Dial that it discloses the

Personal Reading Information of its customers, and Plaintiff Dial has never authorized ACM to do so.  Furthermore, Plaintiff Dial was never provided any written notice that ACM rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *CBS Watch!*, and during the relevant pre-July 31, 2016 time period, ACM disclosed, from within the State of Michigan, Plaintiff Dial's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives (who then supplemented that information with data from their own files) – without obtaining consent from or even providing prior notice to Plaintiff Dial.  At all times after Plaintiff Dial became a *CBS Watch!* subscriber but prior to ACM's disclosure of her Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff Dial that it would disclose her Personal Reading Information.  Likewise, at all times after Plaintiff Dial became a *CBS Watch!* subscriber but prior to ACM's disclosure of Plaintiff Dial's Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff Dial's consent in Michigan

prior to disclosing her Personal Reading Information from its headquarters in Michigan. Moreover, during the relevant pre-July 31, 2016 time period, and also from its headquarters in Michigan, ACM rented or exchanged mailing lists containing Plaintiff Dial's Personal Reading Information to third parties seeking to contact *CBS Watch!* subscribers, without first obtaining Plaintiff Dial's written consent or even giving her prior notice of these rentals, exchanges, and/or other disclosures – informed consent which ACM was likewise required to obtain from Plaintiff Dial while ACM was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by ACM at its corporate headquarters in Okemos, Michigan assuming it had been requested by ACM and provided by Plaintiff Dial).

12. Plaintiff Markowitz is a natural person and citizen of the State of Michigan and resides in Southfield, Michigan. Plaintiff Markowitz was a subscriber to *CBS Watch!* magazine, including prior to July 31, 2016. While residing in, a citizen of, and present in Michigan, Plaintiff Markowitz purchased her subscription to *CBS Watch!* magazine directly from ACM, by sending ACM money to its headquarters in Okemos, Michigan. ACM collected the money paid to it by Plaintiff Markowitz for her *CBS Watch!* subscriptions in Michigan. Prior to and at the time Plaintiff Markowitz subscribed to *CBS Watch!*, ACM did not notify Plaintiff Markowitz that it discloses the Personal Reading Information of its customers, and

Plaintiff Markowitz has never authorized ACM to do so.  Furthermore, Plaintiff Markowitz was never provided any written notice that ACM rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *CBS Watch!*, and during the relevant pre-July 31, 2016 time period, ACM disclosed, from within the State of Michigan, Plaintiff Markowitz's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives (who then supplemented that information with data from their own files) – without obtaining consent from or even providing prior notice to Plaintiff Markowitz.  At all times after Plaintiff Markowitz became a *CBS Watch!* subscriber but prior to ACM's disclosure of her Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff Markowitz that it would disclose her Personal Reading Information.  Likewise, at all times after Plaintiff Markowitz became a *CBS Watch!* subscriber but prior to ACM's disclosure of Plaintiff Markowitz's Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff Markowitz's consent in

Michigan prior to disclosing her Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 31, 2016 time period, and also from its headquarters in Michigan, ACM rented or exchanged mailing lists containing Plaintiff Markowitz's Personal Reading Information to third parties seeking to contact *CBS Watch!* subscribers, without first obtaining Plaintiff Markowitz's written consent or even giving her prior notice of these rentals, exchanges, and/or other disclosures – informed consent which ACM was likewise required to obtain from Plaintiff Markowitz while ACM was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by ACM at its corporate headquarters in Okemos, Michigan assuming it had been requested by ACM and provided by Plaintiff Markowitz).  Moreover, also prior to July 31, 2016, Plaintiff Markowitz purchased a subscription to *CBS Watch!* magazine directly from POCS while she resided in, was a citizen of, and was present in Michigan.  Prior to and at the time Plaintiff Markowitz purchased a subscription to *CBS Watch!* from POCS, POCS did not notify Plaintiff Markowitz that it discloses the Private Reading Information of its customers, and Plaintiff Markowitz has never authorized POCS to do so. Furthermore, Plaintiff Markowitz was never provided any written notice that POCS rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  During the relevant pre-July 31, 2016 time period, POCS

disclosed, without the requisite consent or prior notice, Plaintiff Markowitz's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, POCS rented or exchanged mailing lists containing Plaintiff Markowitz's Private Reading Information to third parties seeking to contact *CBS Watch!* subscribers, without first obtaining the requisite written consent from Plaintiff Markowitz or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

13.    Plaintiff Feen is a natural person and citizen of the State of Michigan and resides in Warren, Michigan.  Plaintiff Feen was a subscriber to *CBS Watch!* magazine, including prior to July 31, 2016.  While residing in, a citizen of, and present in Michigan, Plaintiff Feen purchased his subscription to *CBS Watch!* magazine directly from ACM, by sending ACM money to its headquarters in Okemos, Michigan.  ACM collected the money paid to it by Plaintiff Feen for his *CBS Watch!* subscriptions in Michigan.  Prior to and at the time Plaintiff Feen subscribed to *CBS Watch!*, ACM did not notify Plaintiff Feen that it discloses the Personal Reading Information of its customers, and Plaintiff Feen has never authorized ACM to do so.  Furthermore, Plaintiff Feen was never provided any written notice that ACM rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to

*CBS Watch!*, and during the relevant pre-July 31, 2016 time period, ACM disclosed, from within the State of Michigan, Plaintiff Feen's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives (who then supplemented that information with data from their own files) – without obtaining consent from or even providing prior notice to Plaintiff Feen.  At all times after Plaintiff Feen became a *CBS Watch!* subscriber but prior to ACM's disclosure of his Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore in Michigan at the time it was required to, but did not, notify Plaintiff Feen that it would disclose his Personal Reading Information.  Likewise, at all times after Plaintiff Feen became a *CBS Watch!* subscriber but prior to ACM's disclosure of Plaintiff Feen's Personal Reading Information during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan, maintained its principal place of business in Michigan, and was a citizen of Michigan, and was therefore physically present in Michigan at the time it was required to, but did not, obtain Plaintiff Feen's consent in Michigan prior to disclosing his Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 31, 2016 time period, and also from its headquarters in Michigan, ACM rented or exchanged mailing lists containing Plaintiff Feen's Personal Reading Information to third parties seeking to

contact *CBS Watch!* subscribers, without first obtaining Plaintiff Feen's written consent or even giving him prior notice of these rentals, exchanges, and/or other disclosures – informed consent which ACM was likewise required to obtain from Plaintiff Feen while ACM was headquartered in Michigan, a citizen of Michigan, and physically present in Michigan (and which would have been received by ACM at its corporate headquarters in Okemos, Michigan assuming it had been requested by ACM and provided by Plaintiff Feen).

14.     Defendant American Collegiate Marketing, Inc. is a Michigan corporation with its headquarters and principal place of business in Okemos, MI. ACM does business throughout Michigan and the entire United States.  ACM is in the business of selling subscriptions to *CBS Watch!* magazine directly to consumers.

15.     Defendant Priority One Clearing Services, LLC is a Florida corporation with its headquarters and principal place of business in Clearwater, Florida.  POCS does business throughout Michigan and the entire United States. POCS is in the business of selling subscriptions to *CBS Watch!* magazine directly to consumers.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and

costs, and at least one member of each of the Classes is a citizen of a state different from the respective Defendants.

17.     Personal jurisdiction and venue are proper with respect to all Plaintiffs' claims against ACM because ACM maintains its corporate headquarters and principal place of business in Michigan.

18.     The Court has personal jurisdiction over POCS because Plaintiff Markowitz's claim arose in substantial part from actions and omissions in Michigan, including from her purchase of a *CBS Watch!* subscription from POCS in Michigan, POCS's direction of such *CBS Watch!* subscription into Michigan, and POCS's failure to obtain Plaintiff Markowitz's written consent in Michigan prior to disclosing her Private Reading Information, including her residential address, in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan.  Personal jurisdiction also exists over POCS in Michigan because it conducts substantial business within Michigan, such that it has significant, continuous, and pervasive contacts with the State of Michigan.

19.     Venue is proper in this District as to Plaintiff Markowitz's claim against POCS pursuant to 28 U.S.C. § 1391 because Plaintiff Markowitz resides in this judicial District, POCS does substantial business in this judicial District, POCS is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff Markowitz's claim took place within this judicial

District.

# **FACTUAL BACKGROUND**

## ***Michigan's Preservation of Personal Privacy Act***

20.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

21.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

22.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

15

PPPA § 2 (emphasis added).

23.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

24.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

25.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

26.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter,

and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

27.     Despite the fact that thousands persons subscribe to *CBS Watch!* magazine, both across the U.S. and within Michigan, Defendants disregarded their legal responsibilities to these individuals by systematically violating the PPPA.

### The Private Information Market: Consumers' Private Information Has Real Value

28.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

29.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a

---

[3]     **Exhibit C**, The Information Marketplace:   Merging and Exchanging Consumer   Data   (Mar.   13,   2001),   at   8:15-11:16,   *available   at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last   visited July 30, 2021).

$26 billion dollar per year online advertising industry in the United States.[4]

30.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

31.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

32.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying

---

[4]     *See* **Exhibit D**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[5]     **Exhibit E**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

[6]     *See* **Exhibit F**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

habits, household health worries, vacation dreams—and on and on."[7]

33.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

34.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

35.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden

---

[7]     **Exhibit G**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[8]     **Exhibit H**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[9]     *See* **Exhibit I**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

36.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

37.     Information disclosures like those made by Defendants are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services,

---

[10]     *Id.*

[11]     *See* **Exhibit J**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[12]     **Exhibit K**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

and are lonely for the companionship that telephone callers provide."[13]   The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

38.     Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

39.     Defendants not alone in jeopardizing subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

40.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.

---

[13]     *Id.*

[14]     **Exhibit L**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[15]     *See id.*

Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

41.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

42.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

43.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

44.     In fact, consumers' private information has become such a valuable

---

[16]     *See* **Exhibit M**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[17]     *Id.*

commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

45.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

46.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

---

[18]     *See* **Exhibit N**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[19]     *See* **Exhibit O**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[20]     *See* **Exhibit P**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

### *Defendants Unlawfully Rent, Exchange, and Disclose*
### *Their Customers' Private Reading Information*

47.     Each of the Defendants maintains a vast digital database comprised of

its customers' Private Reading Information, and discloses its customers' Private

Reading Information to data aggregators and appenders – including, without

limitation, Nextmark, Inc. and Wiland, Inc. – which then supplement that

information with additional sensitive private information about each customer,

including his or her gender.  (*See, e.g.*, **Exhibit A**).  ACM makes these disclosures

of its customers' Personal Reading Information from its headquarters in Okemos,

Michigan.

48.     Defendants then rent and/or exchange mailing lists—which include

subscribers' Private Reading Information identifying which individuals purchased

subscriptions to *CBS Watch!* magazine, and can include the sensitive information

obtained from data aggregators and appenders—to other data aggregators and

appenders, other consumer-facing businesses, non-profit organizations seeking to

raise awareness and solicit donations, and to political organizations soliciting

donations, votes, and volunteer efforts.  (*See* **Exhibit A**).  ACM makes these rentals

and exchanges of its customers' Personal Reading Information from its headquarters

in Okemos, Michigan.

49.     Defendants    also    disclose    their    customers'    Private    Reading

Information to data cooperatives (including but not limited to Wiland), which in turn

gives Defendants access to their own mailing list databases. ACM makes these disclosures of its customers' Personal Reading Information to data cooperatives from its headquarters in Okemos, Michigan, and accesses the data cooperatives' mailing list databases that it receives in return in Michigan.

50.     As a result of Defendants' data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Defendants that identify their customers by their most intimate details such as their gender.  Defendants' disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

51.     Defendants do not seek their customers' prior consent, written or otherwise, for any of these disclosures and their customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

52.     At all times prior to disclosing its customers' Personal Reading Information, including during the relevant pre-July 31, 2016 time period, ACM was headquartered in Michigan with its principal place of business in Michigan, and was physically present in Michigan at the time it was required to, but did not, obtain its customers' informed consent prior to disclosing all of its Personal Reading Information from its headquarters in Michigan.  Moreover, during the relevant pre-July 31, 2016 time period, and also from its headquarters in Michigan, ACM rented

25

or exchanged mailing lists containing all of its customers' Personal Reading Information to third parties seeking to contact *CBS Watch!* magazine subscribers, without first obtaining any of its customers' written consent or even giving them prior notice of these rentals, exchanges, and/or other disclosures – informed consent which ACM was likewise required to obtain from its customers while ACM was headquartered within, a citizen of, and physically present in Michigan (and which would have been received by ACM at its corporate headquarters in Okemos, Michigan had it been requested by ACM and provided by Plaintiffs and Class members).

53.     Consumers can purchase subscriptions to *CBS Watch!* magazine from Defendants through numerous media outlets, including the Internet, telephone, or traditional mail (and, in the case of ACM, by remitting payment to ACM which is thereafter received by ACM in Michigan).   Regardless of how the consumer subscribes, Defendants never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, Defendants uniformly failed to obtain any form of consent from – or even provide effective notice to – their customers before disclosing their customers' Private Reading Information.

54.     As a result, Defendants disclosed their customers' Private Reading

Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

55.     By and through these actions, Defendants have intentionally disclosed to third parties the Private Reading Information of their *CBS Watch!* magazine subscribers (i.e., ACM's subscribers across the U.S., and POCS's subscribers in Michigan) without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs seek to represent two classes.  All Plaintiffs seek to represent a class defined as all United States residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by ACM without consent (the "ACM Class").  Plaintiff Markowitz also seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by POCS without consent (the "POCS Class").  The ACM Class and the POCS Class are hereinafter referred to at times collectively as the "Classes."

57.     Excluded   from   the   Classes   is   any   entity   in   which   either   of   the

---

[21]     **Exhibit Q**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

Defendants has a controlling interest, and officers or directors of Defendants.

58.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of each of the Classes number in the thousands.  The precise number of members of the Classes and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

59.     Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members. Common legal and factual questions include, but are not limited to: (a) whether each of the Defendants is a "retailer or distributor" of publications (i.e., magazines); (b) whether Defendants obtained consent before disclosing to third parties Plaintiffs' and each member of the Class's Private Reading Information; and (c) whether Defendants' disclosures of Plaintiffs' and members of the Classes' Private Reading Information violated the PPPA (and, with respect to ACM, when such disclosures violated the PPPA in Michigan).

60.     The claims of the named Plaintiffs are typical of the claims of the Classes in that the named Plaintiffs and the Classes suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosures of

Plaintiffs' and the Classes' Private Reading Information.

61.     Plaintiffs are adequate representatives of each of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

62.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of either of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## FIRST CAUSE OF ACTION

**Violation of Michigan's Preservation of Personal Privacy Act, by Plaintiff Markowitz, Individually and on Behalf of the POCS Class, Against POCS (PPPA § 2)**

63.     Plaintiff Markowitz repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     Plaintiff Markowitz brings this claim individually and on behalf of members of the POCS Class against Defendant POCS.

65.     POCS is a company that sells subscriptions to *CBS Watch!* magazine to consumers.   Accordingly, POCS is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

66.     By purchasing a subscription to *CBS Watch!* magazine from POCS, Plaintiff Markowitz purchased written materials directly from POCS.  *See* PPPA § 2.

67.     Because Plaintiff Markowitz purchased written materials directly from POCS, Plaintiff Markowitz is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

68.     At various times during the pre-July 31, 2016 time period, POCS disclosed Plaintiff Markowitz's Private Reading Information, which identified her as a *CBS Watch!* customer, in at least three ways.

69.     First, POCS disclosed mailing lists containing Plaintiff Markowitz's

Private Reading Information to data aggregators and data appenders – including, without limitation, Nextmark, Inc. and Wiland, Inc. – who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to POCS.

70.     Second, POCS disclosed mailing lists containing Plaintiff Markowitz's Private Reading Information to data cooperatives, including but not limited to Wiland, who in turn gave POCS access to their own mailing list databases.

71.     Third, POCS rented and/or exchanged its mailing lists containing Plaintiff Markowitz's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

72.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and POCS was able to increase its profits gained from the mailing list rentals and/or exchanges.

73.     By renting, exchanging, or otherwise disclosing its entire customer lists during the relevant pre-July 31, 2016 time period, POCS disclosed to persons other than Plaintiff Markowitz records or information concerning her purchases of written materials from POCS.  *See* PPPA § 2.

74.     The information POCS disclosed indicated Plaintiff Markowitz's name

and address, as well as the fact that she subscribed to *CBS Watch!*.  Accordingly, the records or information disclosed by POCS indicated Plaintiff's identity.  *See* PPPA § 2.

75.    Plaintiff Markowitz and the members of the POCS Class never consented to POCS disclosing their Private Reading Information to anyone.

76.    Worse yet, Plaintiff Markowitz and the members of the POCS Class did not receive notice before POCS disclosed their Private Reading Information to third parties.

77.    POCS's disclosures of Plaintiff Markowitz's and the POCS Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

78.    POCS's disclosures of Plaintiff Markowitz's and the POCS Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

79.    POCS's disclosures of Plaintiff Markowitz's and the POCS Class's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase POCS's revenue.  Accordingly, POCS's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff

Markowitz and the members of the POCS Class.

80.     By disclosing Plaintiff Markowitz's and the POCS Class's Private Reading Information during the relevant pre-July 31, 2016 time period, POCS violated Plaintiff Markowitz's and the POCS Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

81.     As a result of POCS's unlawful disclosures of their Private Reading Information, Plaintiff Markowitz and the members of the POCS Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of herself and the POCS Class, Plaintiff Markowitz seeks: (1) $5,000.00 to Plaintiff Markowitz and each POCS Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## SECOND CAUSE OF ACTION

**Violation of Michigan's Preservation of Personal Privacy Act, by all Plaintiffs, Individually and on Behalf of the ACM Class, Against ACM (PPPA § 2)**

82.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

83.     Plaintiffs bring this claim individually and on behalf of members of the ACM Class against Defendant ACM.

84.     ACM oversees the sale of subscriptions to *CBS Watch!* from within Michigan.

85.    ACM collects the money that its customers pay for subscriptions to *CBS Watch!* within Michigan.

86.    Plaintiffs are informed and believe, and thereupon allege, that ACM collects in Michigan and thereafter deposits in Michigan the money that it receives from its customers who paid for subscriptions to *CBS Watch!* into bank accounts held at financial institutions in Michigan.

87.    ACM sends to customers their issues of *CBS Watch!* from Michigan, and/or oversees such mailings from within Michigan.

88.    ACM interacts and communications with its customers from its corporate headquarters in Michigan. ACM has been a citizen of Michigan, headquartered in Michigan, and physically present in Michigan at all times relevant to this action, including prior to disclosing and at the time it disclosed all of its *CBS Watch!* customers' Personal Reading Information from within Michigan. Accordingly, prior to disclosing its *CBS Watch!* customers' Personal Reading Information from within Michigan, ACM could have, from and while present in Michigan, provided notice to its *CBS Watch!* customers to inform its customers that it would be disclosing their Personal Reading Information, but it failed to do so. Likewise, prior to disclosing its *CBS Watch!* customers' Personal Reading Information from within Michigan, ACM could have, from and while present in Michigan, obtained its *CBS Watch!* customers consent to its disclosures of their

Personal Reading Information from within Michigan.

89.   As a company that sells subscriptions to *CBS Watch!* magazine to consumers, ACM is engaged in the business of selling written materials at retail from within Michigan. *See* PPPA § 2.

90.   By purchasing subscriptions to *CBS Watch!* magazine, Plaintiffs each purchased written materials directly from ACM. *See* PPPA § 2.

91.   Because Plaintiffs purchased written materials directly from ACM, they are each a "customer" within the meaning of the PPPA. *See* PPPA § 1.

92.   At various times during the relevant pre-July 31, 2016 time period, ACM disclosed Plaintiffs' Personal Reading Information, which identified them as *CBS Watch!* magazine subscribers and customers, in at least three ways, all from its corporate headquarters within Michigan.

93.   First, ACM disclosed, from within Michigan, mailing lists containing Plaintiffs' Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to ACM in Michigan, which ACM received in Michigan.

94.   Second, ACM disclosed, from within Michigan, mailing lists containing Plaintiffs' Personal Reading Information to data cooperatives, who in turn gave ACM access to their own mailing list databases, which ACM accessed in

Michigan.

95.    Third, ACM rented and/or exchanged, from within Michigan, its mailing lists containing Plaintiffs' Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work, including without limitation Nextmark.

96.    All of the money that ACM received from the third parties to whom it disclosed Plaintiffs' Personal Reading Information was sent to ACM's headquarters in Michigan and was received by ACM at its headquarters in Michigan.

97.    Because the mailing lists ACM disclosed from within Michigan included additional personal and demographic information from data aggregators and appenders, the lists were more valuable, and ACM was able to increase its profits gained from the mailing list rentals and/or exchanges, profits ACM received in Michigan.

98.    By renting, exchanging, or otherwise disclosing its *CBS Watch!* customer lists, during the relevant pre-July 31, 2016 time period, from within Michigan, ACM disclosed to persons other than Plaintiffs, from within Michigan, records or information concerning their purchases of written materials from ACM. *See* PPPA § 2.  All of ACM's records concerning Plaintiffs' purchases of written

materials that were disclosed by ACM were, prior to their disclosure, stored by and accessible to ACM in its headquarters in Michigan. Accordingly, ACM's disclosures of Plaintiffs' Personal Reading Information originated from within Michigan.

99. The information ACM disclosed from its headquarters in Michigan indicated Plaintiffs' names and addresses, as well as the fact that each of them subscribed to *CBS Watch!*. Accordingly, the records or information disclosed by ACM from within Michigan indicated Plaintiffs' identities. *See* PPPA § 2.

100. Plaintiffs and the members of the ACM Class never consented to ACM disclosing their Personal Reading Information to anyone.

101. Worse yet, Plaintiffs and the members of the ACM Class did not receive notice before ACM disclosed their Personal Reading Information to third parties.

102. ACM's disclosures of Plaintiffs' and the ACM Class's Personal Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

103. ACM's disclosures of Plaintiffs' and the ACM Class's Personal Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

104. ACM's disclosures of Plaintiffs' Personal Reading Information during the relevant pre-July 31, 2016 time period originated from within Michigan and were

made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase ACM's revenue and profit, which is subject to taxation by the State of Michigan. Accordingly, ACM's disclosures of its customers' Personal Reading Information in Michigan were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the ACM Class.

105. By disclosing Plaintiffs' Personal Reading Information during the relevant pre-July 31, 2016 time period from within Michigan, while it was headquartered in and a citizen of Michigan, ACM invaded Plaintiffs' and the ACM Class's statutorily-protected right to privacy in their reading habits in violation of the PPPA from within Michigan. *See* PPPA § 2.

106. On behalf of themselves and the ACM Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each ACM Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendants as follows:

> A.   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes;
>
> B.   For an order declaring that Defendants' conduct as

38

described herein violated the Preservation of Personal Privacy Act;

C. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D. For an award of $5,000 to each of the Plaintiffs and each member of the Classes, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E. For prejudgment interest on all amounts awarded; and

F. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: November 1, 2022                    Respectfully submitted,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiffs and the Putative
Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com